UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

PAYROLL LLC, a Florida limited liability company,

Case No. 9:26-cv-81060-AHS

Plaintiff,

v.

ADP, INC., a Delaware corporation,

Defendant.
_________________________________________/

**FIRST AMENDED COMPLAINT**

Plaintiff, PAYROLL LLC ("Payroll LLC"), through the undersigned and pursuant to Rule 15, files this First Amended Complaint against Defendant, ADP, INC. ("ADP"), and alleges:

The exhibits to the original complaint [DE 1-1 to DE 1-11] are incorporated by reference.

**INTRODUCTION**

1. ADP sells payroll service two ways. It sells directly to the business owner, which ADP calls retail. It also sells at a lower, wholesale price to accounting firms, which sign up their own clients and run their payrolls on ADP's platform.

2. Payroll LLC, a small Florida company run by one person, Alex Feldman, was one of ADP's wholesale partners. ADP's Terms and Conditions of Service (the "Partner Agreement") barred each side from targeting the other's clients.

3. In early 2020, ADP took 26 restaurant clients away from Payroll LLC and gave them to another wholesale partner. To settle that dispute, ADP paid Payroll LLC $35,000. In addition, ADP promised in writing in March 2020 that when an ADP retail client wanted to move from ADP's retail platform to Payroll LLC's cheaper ADP wholesale platform, in the normal course of

business, "we will accept the transfer." In return, Payroll LLC gave up a claim on a book of business worth $474,400, for which it had demanded $500,000. It did so in reliance on ADP's promise. The promise was a door into ADP's own customer base.

4. ADP came to regret the deal. At least once a quarter between 2020 and 2022, ADP asked to buy Payroll LLC's client base. Payroll LLC said no every time. Meanwhile the right was working. In under four months from January to April 2022, Payroll LLC added about 150 clients, a faster pace than ever before, and almost all of them were ADP retail clients moving to wholesale.

5. Around the same time, in early 2022, ADP's staff began telling Payroll LLC's clients and prospects that ADP did not know Payroll LLC, or that it was a scam, while ADP's own legal department was approving in writing the email signature in which Payroll LLC identified itself as an ADP wholesale partner and onboarding the accounts Payroll LLC was bringing to the ADP wholesale platform. Feldman complained in writing on April 1 and April 14, 2022. On April 14, ADP's own district manager confirmed in writing to a prospect that Payroll LLC was "a direct wholesale partner with ADP." On April 19, ADP scheduled a call. On April 26, 2022, ADP ended the relationship on sixty days' notice. It gave no reason.

6. ADP then closed every exit. Seventeen days after the notice, and before the first meeting it agreed to hold with Payroll LLC, ADP told every Payroll LLC client in writing that ADP was ending the relationship. It refused to explain, to work anything out, or to give more time, even a few days to reach the end of the quarter. It refused to let Payroll LLC sell the business to anyone but ADP, even a buyer willing to take it on the same program terms, which would have cost ADP nothing. Ending Payroll LLC's right to transfer clients from the retail to the wholesale platform was ADP's goal. With no other choice, Payroll LLC sold its client base to ADP in July 2022 at a price ADP set.

7. This case is not about whether ADP could end a contract on notice. It is about how and why ADP did it. New Jersey law, which governs the Partner Agreement, does not let a party use its contract rights in bad faith to take away the benefits it promised the other side.

**PARTIES, JURISDICTION, AND VENUE**

8. Plaintiff PAYROLL LLC is a Florida limited liability company with its principal place of business in Palm Beach County, Florida. It has two members: Alex Feldman, a citizen of Florida, and Sunrise Money Management Corp., a Florida corporation with its principal place of business in Florida. Payroll LLC is a citizen of Florida and of no other state.

9. Defendant ADP, INC. is a Delaware corporation with its principal place of business in Roseland, New Jersey. ADP does substantial business throughout Florida and kept the office that serviced Payroll LLC in this District.

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, not counting interest and costs.

11. This Court has personal jurisdiction over ADP because ADP carries on business in Florida, performed and breached the agreements described below in substantial part in Florida, and caused the injury at issue in Florida.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims happened here. Payroll LLC operated here, and the ADP team that dealt with Payroll LLC worked in substantial part out of ADP's West Palm Beach office.

## HOW ADP SELLS PAYROLL: RETAIL AND WHOLESALE

**A. The Two Platforms**

13. In the retail platform, ADP contracts directly with the business owner. The owner is ADP's customer. ADP sets the price, bills the owner, holds the relationship, and can sell the owner other ADP products. This is the relationship most business owners are familiar with.

14. In the wholesale platform, which ADP calls RUN Powered by ADP Payroll for Partners, a wholesale partner contracts with ADP, brings its own clients onto ADP's platform, and acts as each client's point of contact. ADP bills the partner at a deep discount from retail pricing, and the partner sets its own price to the client: "it shall be You and not ADP that shall determine the fees to be charged the Clients for payroll processing and for accessing RUN." [DE 1-3 at 7, § 2(B)].

15. In both platforms ADP does the same work. It calculates the payroll, moves the money, files the payroll tax returns, and hosts the software. What changes is whose customer it is and how much ADP makes.

**B. Why the difference matters to ADP**

16. Under Payroll LLC's pricing agreement, as amended on October 1, 2019, Payroll LLC received a 50% discount on payroll and tax filing fees. [DE 1-5]. In practice, Payroll LLC paid ADP about $50 per client per month, about $600 a year, compared to ADP's standard retail rate for a similar client of about $2,400 a year.

17. So a move from retail to wholesale does not cost ADP the payroll client. What ADP loses most importantly is the "ownership" of the client, since a wholesale partner can later move its clients off ADP's platform. Effectively, the client becomes the asset/property of Payroll LLC and not ADP. In addition, ADP loses pricing power, the billing relationship, the direct line to the customer, and the chance to sell that customer other ADP services.

18. Both sides understood this. Section 8 of the Partner Agreement runs in both directions: in Section 8(C), the partner agreed not to solicit ADP's known retail clients, and in Section 8(B), ADP agreed not to knowingly engage in concerted, targeted marketing to the partner's clients. [DE 1-3 at 15, § 8(B), (C)]. Section 8(C), titled "Non-Solicitation by Partner," was the wall around ADP's retail base. The March 2020 settlement put a door in that wall and gave Payroll LLC the key.

**C. The scale of what the door opened**

19. In its Form 10-K for the fiscal year ended June 30, 2022, ADP reported that RUN Powered by ADP served more than 800,000 small businesses. On information and belief, most are retail clients that ADP bills directly.

20. Payroll LLC was small, but it was not aiming small. By the time ADP terminated its relationship with Payroll LLC, its own client list had grown to more than 1,500 businesses through its Employee Retention Credit work, and it later grew to almost 7,000. Each was already Payroll LLC's client and a prospect for its payroll service. Any of them on ADP retail that wanted to move could come across to Payroll LLC's wholesale service in the normal course of business.

21. In January 2022, Payroll LLC began a fully committed approach to bringing on payroll clients. Feldman told ADP's Nick Octavi, Lynne Shepard, and Gabby Zinman that he was forming a new affiliate to expand his payroll business based around the ADP wholesale partnership. ADP knew Feldman's payroll business was expanding because of the unusually high volume of new client accounts Feldman was boarding onto the ADP wholesale platform.

22. On information and belief, ADP also worried that the transfer right would spread. ADP has many wholesale partners. If one could bring ADP's retail clients across, others would ask for the same thing, and the wall around ADP's retail base would come down.

## RELEVANT BACKGROUND FACTS

**D. The Wholesale Partnership**

23. On November 26, 2018, MF Tax Group, Feldman's accounting firm, enrolled in ADP's RUN Powered by ADP Payroll for Partners program, and the wholesale business began on January 1, 2019. Payroll LLC took over that business from MF Tax Group on October 1, 2019 and ran it from then on.

24. The program was governed by the Partner Agreement [DE 1-3], and by a pricing agreement [DE 1-4] and an October 1, 2019 pricing amendment that ADP issued to Payroll LLC as the "Firm," Payroll LLC signed, and ADP honored [DE 1-5].

25. Payroll LLC succeeded to MF Tax Group's rights and duties under the Partner Agreement, and ADP knew of and agreed to the change. From October 2019 forward, ADP billed Payroll LLC, took its payments, dealt with it on client transfers, gave it the October 1, 2019 pricing amendment, settled with it in March 2020, and ended the relationship by a letter addressed to Payroll LLC that describes the Partner Agreement as an agreement "between Payroll LLC . . . and ADP." [DE 1-10 at 1].

26. In the alternative, ADP and Payroll LLC formed their own agreement on the same terms through that course of dealing.

27. To the extent any claim pleaded here belongs to Alex Feldman individually, or to MF Tax Group, rather than to Payroll LLC, Feldman and MF Tax Group have assigned that claim to Payroll LLC.

**E. Key terms of the Partner Agreement**

28. The Partner Agreement is governed by New Jersey law. [DE 1-3 at 17, § 11(G)].

29. Section 2(B) makes the wholesale partner the "initial, primary and," with limited exceptions, "sole point of contact for the Clients with respect to RUN," and states that "ADP shall use commercially reasonable efforts to notify You of all instances in which ADP directly contacts Clients." [DE 1-3 at 6, § 2(B)].

30. Section 6(D) lets the partner use ADP's name in its marketing with ADP's written approval, "such approval not to be unreasonably withheld." [DE 1-3 at 11, § 6(D)(ii)].

31. Section 10(A) lets either side end the Partner Agreement, after its first year, on at least sixty days' written notice. [DE 1-3 at 16, § 10(A)]. It does not say that a party may use that right for any purpose at all, or to take away rights the other side holds under a separate agreement.

32. Section 11(C) says the Partner Agreement may not be assigned by either side "without the prior written consent of the other party." [DE 1-3 at 17, § 11(C)]. It sets no standard for consent and does not say consent may be refused for any reason or in a party's sole discretion. Where ADP wanted a free hand, the Partner Agreement says so: Section 10(B)(iv) ("in ADP's sole opinion"), Section 10(C) ("in its sole discretion"), and Section 6(D)(iii) ("at ADP's sole discretion"). [DE 1-3 at 11, 16]. Section 11(C) has no such words.

33. Section 9(B) caps ADP's damages in any calendar year at the lesser of the partner's actual damages or one month of average fees. It begins, "Notwithstanding anything to the contrary contained in these Terms of Service," and its last sentence states that the cap "shall not apply to actual damages incurred by You as a direct result of the criminal or fraudulent acts or willful misconduct of ADP or any of its employees." [DE 1-3 at 15, § 9(B)].

34. Section 9(E) states that ADP will not be responsible for consequential damages or lost profits "in connection with this Agreement, these Terms and Conditions of Service, the Services, or ADP Products." It sits in a section titled "Limitation of Liability" whose other parts deal with

payroll errors, tax penalties, and failed deposits, and it does not say that it applies to ADP's own willful misconduct or bad faith. [DE 1-3 at 15–16, § 9].

35. Section 6(D)(iv), titled "Disclaimer of Warranties," sits in the trademark part of the Partner Agreement, Section 6(D), "Marketing Materials and Trademark Usage." [DE 1-3 at 12, § 6(D)(iv)]. It disclaims warranties "with respect to the ADP Marks," then states that ADP will not be liable "for any damages for termination of these Terms of Service or for Your use of the ADP Marks, including . . . any consequential . . . damages . . . arising from or related to Your marketing, distribution, any use or termination of use of the ADP Marks or web site." Read where it sits and as a whole, the clause addresses the end of the partner's license to use ADP's marks, not how ADP performs the Partner Agreement or why it ends it. Payroll LLC does not claim damages for the termination itself; it claims damages for ADP's bad faith conduct. And Section 9(B), which applies "[n]otwithstanding anything to the contrary" in the Partner Agreement, preserves actual damages for ADP's willful misconduct whatever Section 6(D)(iv) says. New Jersey law does not enforce a clause that would excuse a party's own intentional, bad faith conduct, and ADP, which wrote the form, cannot read one in.

36. The Partner Agreement has no clause requiring changes to be in a signed writing; the partner agrees to be bound by the terms "including any modifications from time to time." [DE 1-3 at 1]. Its integration clause replaces only "previous and/or existing agreements" and does not bar later agreements or changes. [DE 1-3 at 17, § 11(B)].

**F. Early 2019: ADP breaches first, and Feldman works it out**

37. One of the first clients MF Tax Group brought onto the RUN platform was First Class Daycare in Jupiter, Florida, a wholesale client from about January 1, 2019. One to two months later, ADP's retail sales team solicited the client to move to the ADP retail platform.

38. ADP knew it was Feldman's client, as all of this is flagged in the ADP system to prevent soliciting each other's clients. ADP gave it a lower retail quote anyway and moved the account from wholesale to retail without the notice to Feldman and the approval from him that ADP's own process required.

39. Feldman raised the problem with ADP sales executive Nick Octavi and scheduled a call with a senior ADP executive, Kevin Durio, who acknowledged the breach. ADP paid Feldman's firm $2,500, increased the wholesale partner discount from 35% to 50% of ADP's standard wholesale rate, and Feldman agreed not to pursue the claim. The discounted rate was later put in writing in the October 1, 2019 pricing amendment. [DE 1-5].

40. This set a pattern. ADP and Feldman changed the terms of their relationship by agreement, first in conversation and email and later on paper. When ADP breached, Feldman raised the problem through ADP's own people and worked it out.

**G. Mid 2019: the sign franchise campaign, and ADP shuts the door**

41. After the first quarter of 2019, Feldman's firm pushed to grow its payroll client base, including by reaching out to franchisees of two sign franchise systems, Signarama and FASTSIGNS. By letter dated August 22, 2019, ADP's senior counsel demanded that the firm stop that solicitation, citing Section 8(C). [DE 1-6].

42. ADP did not end the Partner Agreement over this. Instead, it shut off every means Feldman had to move retail clients to wholesale and said it would not accept client transfers from his firm until further notice. ADP was content to keep Feldman as a wholesale partner. What it would not tolerate was Feldman reaching into its retail base. Feldman kept signing up clients who were not ADP customers.

**H. Fall 2019: the handoff ADP approved, and the promise it did not keep**

43. In October 2019, ADP allowed Feldman to move the wholesale business from MF Tax Group to Payroll LLC on the same program terms, including the 50% rate. In December 2020, ADP approved moving the 111 client accounts still under MF Tax Group's firm code into Payroll LLC's firm code in bulk, and ADP's relationship manager told ADP's orders team the clients were "just moving from one firm view to the other." A handoff of the business from one firm to another on the same terms is exactly what ADP refused to allow in 2022.

44. Throughout 2019, ADP kept offering to buy Feldman's book of business, and Feldman refused every offer. He kept asking ADP to reopen the retail-to-wholesale pipeline, offering to bring ADP two clients from other providers for every one retail client moved to wholesale. In late summer 2019, his ADP wholesale representatives told him the pipeline would be turned back on so long as he did not leave for a competitor.

45. Relying on those assurances, Feldman bought an accounting firm in Boynton Beach, Florida with a large payroll client base, another in Tennessee that served a large group of restaurants (the "Tennessee Restaurant Clients"), and, in February 2020, a third in Tamarac, Florida.

46. In fall 2019 he told ADP he would move his client base to SurePayroll, a division of Paychex, unless ADP lifted the freeze. ADP told him it would give him the ability to move retail clients, and in reliance on that promise he put the new firms' clients on ADP's wholesale platform instead.

47. ADP kept only part of that promise. On September 22, 2019, Feldman asked Octavi for something in writing, because he was "not excited about the prospect of receiving another" cease and desist letter. Octavi answered the same day: "Please use this as confirmation that ADP will

accept retail transfers from new Acquisitions of firms that MF Tax or Payroll LLC buy. At this time no transfers will be accepted outside of these parameters." He added that he would "confirm with JJ," an ADP manager, about anything broader.

48. So ADP reopened the door only for clients of firms Feldman bought. The ability to receive ADP retail clients who wanted to move did not arrive until the March 2020 settlement.

**I. Early 2020: ADP Takes the Tennessee Restaurant Clients**

49. By January 1, 2020, Payroll LLC had moved the clients of the Tennessee firm it bought onto ADP's wholesale platform. Among them was one group of 26 restaurants under common ownership, the Tennessee Restaurant Clients. Within two months of Payroll LLC transferring the accounts to the wholesale platform, Anthony Horton, an ADP Divisional Vice President and General Manager, approved taking those 26 clients away from Payroll LLC and unilaterally authorized their transfer to a different, Tennessee-based ADP wholesale partner, without Payroll LLC's consent and outside the normal client transfer process.

50. Before ADP moved them, the 26 Tennessee Restaurant Clients paid Payroll LLC $19,550 a month in recurring fees, between $550 and $800 per restaurant, plus about $100 a year each in annual year-end payroll fees, about $237,200 a year in all. When ADP unilaterally authorized another wholesale partner to take those accounts from Feldman by force and against his direct refusal, that recurring annual revenue went to zero.

51. Based on the valuation that ADP eventually placed on Feldman's business, valued at two years of billings, the Tennessee Restaurant Clients book that ADP took was worth $474,400.

52. Payroll LLC contended that the transfer violated the Partner Agreement, including Section 8(B), and demanded $500,000 for the lost business. It also demanded the retail transfer right ADP had promised in fall 2019 but had not delivered.

**J. March 2020: ADP settles by reopening the door**

53. In March 2020 the parties resolved that dispute after a long conference call. In a March 26, 2020 email, Octavi confirmed the deal in writing, copying Horton and ADP relationship manager Lynne Shepard. ADP apologized for "the miscommunication and the handling of the restaurants." [DE 1-7 at 1].

54. ADP wrote: "In the normal course of business (acquiring firms, soliciting your current clientele, or soliciting prospects for services you render), if you have a conversation with a client or prospect who is a current ADP Client and that Client wants to move to your wholesale services, we will accept the transfer." [DE 1-7 at 1].

55. ADP explained how this fit with the Partner Agreement: "What the language in the Term of Service is designed to prevent is actively targeting or marketing to the ADP base or vice versa." [DE 1-7 at 1]. ADP itself tied the promise to the Partner Agreement and told Payroll LLC what Section 8(C) would mean going forward.

56. ADP also agreed to a $35,000 payment "in good faith" and committed named ADP staff to build a process for the transfers. [DE 1-7 at 1].

57. ADP sent the email to Feldman at the MF Tax Group address he still used, under the subject line "MF Tax Partnership." By then Payroll LLC had taken over the wholesale business and ADP was billing Payroll LLC. The settlement was made with and performed for Payroll LLC.

58. The trade was simple. ADP promised a $35,000 payment and, going forward through the normal course of business, to accept transfers of ADP retail clients who chose to move to Payroll LLC's wholesale service. Payroll LLC released its claims arising from the Tennessee Restaurant Clients dispute. This agreement is called the "2020 Settlement Agreement" in this complaint.

59. The $35,000 was not full payment. Payroll LLC gave up a claim on a book worth $474,400, for which it had demanded $500,000, and accepted $35,000 only because of the going forward transfer right.

60. Payroll LLC took that deal in reliance on the new pipeline into ADP's retail base, and ADP knew it. The right was unique; on information and belief, no other ADP wholesale partner held one. It gave Payroll LLC an approved pipeline into ADP's own customer base less than a year after ADP had shut that pipeline by letter.

61. The 2020 Settlement Agreement has no fixed end date. It does not say ADP may end it on notice, does not mention Section 10(A), and does not say the transfer promise ends if ADP ends the wholesale relationship. It has no limit on liability, no cap on damages, and no waiver of lost profits or consequential damages.

62. The 2020 Settlement Agreement is a separate agreement supported by its own consideration. In the alternative, it changed and added to the Partner Agreement, which ADP's own April 26, 2022 letter describes as the Partner Agreement "as amended." [DE 1-10 at 1]. ADP has treated the email as a settlement agreement: in a December 21, 2022 letter, ADP's outside counsel called it "the 3/26/2020 settlement agreement" and asked Feldman for a copy. [DE 1-11 at 2].

**K. 2020 to 2022: ADP performs, and Payroll LLC grows**

63. ADP began to perform. On April 29, 2020, Shepard wrote to Feldman, copying Octavi, that the $35,000 payment, approved by Anthony Horton, "has been processed." ADP paid Payroll LLC the $35,000 on or about May 4, 2020.

64. ADP also accepted transfers of its retail clients into Payroll LLC's wholesale account for about two years, and treated them as routine. Payroll LLC submitted each one through ADP's

order system, marked as a retail to wholesale transfer, and ADP's retail side approved each one. The first were set up in May and June 2020, within three months of the settlement. For example:

(a) In October 2020, three related accounts, Faith Assembly of God, Faith Christian Academy, and Academy Learning Center, moved from ADP retail account codes to Payroll LLC's wholesale account.

(b) In June 2021, ADP's wholesale service team described a client that had moved in May 2021 as "a Retail to Wholesale transfer."

(c) On July 12, 2021, a representative of ADP's insurance agency wrote to Feldman about "your retail to wholesale transfers" as a known part of his business.

(d) In the week of January 13 to 19, 2022, ADP's wholesale orders team set up about twenty transfers of ADP retail clients to Payroll LLC, noting on each that "the client has received the transfer approval from their retail region" or that ADP was "waiting for the transfer approval from the Retail Team."

(e) Between January and April 2022, Payroll LLC submitted approximately 150 retail-to-wholesale transfer orders.

(f) ADP kept approving transfers in May and June 2022, after the notice.

65. In all, ADP's own order records show more than 250 ADP retail clients moving to Payroll LLC's wholesale service under the 2020 Settlement Agreement: 29 in 2020, 92 in 2021, and approximately 150 between January and April 2022, each submitted through ADP's order system for approval by ADP's retail side.

66. ADP's own managers described the arrangement the same way. On February 3, 2021, when an ADP retail salesman asked Gabby Zinman, ADP's Elite District Manager for Palm Beach, why Feldman was contacting his client, Zinman answered that the email came from

> "my wholesale partner, Alex Feldman owner of payroll LLC and was approved by our legal team to send these emails to prospects or anyone he comes across using ADP as a courtesy to try and grow his book of business."

67. On March 12, 2021, she wrote to an ADP colleague that Feldman "has a team of people cold calling businesses and if he comes across anyone using ADP, he was approved by our legal team to offer them to his wholesale platform with additional discounts," that "This is not me poaching any current ADP Retail clients," and that Feldman used her ADP email address "in case the clients want to call or email to verify him being a partner of ADP."

68. Shepard called Payroll LLC one of ADP's "top partners" (April 19, 2021).

69. Zinman called it "my biggest wholesaler and one of the largest wholesalers in our space" (August 5, 2021).

70. Payroll LLC performed. It released its claims, did not sue, and stayed in the wholesale program in reliance on ADP's promises.

71. After the 2020 settlement, Payroll LLC also took on a short-term project: helping employers claim the Employee Retention Credit, a pandemic era payroll tax credit claimed by amending the employer's quarterly federal payroll tax return on IRS Form 941-X.

72. The payroll business was the long-term project. Every Employee Retention Credit client was a future candidate for Payroll LLC's wholesale service, and the practice grew Payroll LLC's client list to almost 7,000 businesses.

73. ADP knew about Payroll LLC's ERC work from the start: for Payroll LLC's wholesale clients, ADP was the payroll tax filer, and ADP's own teams prepared and filed the amended returns for a fee.

74. On January 31, 2022, Octavi pitched Feldman on ADP's own Employee Retention Credit service, sold to ADP's clients for a contingency fee of 10% to 18% of the credit, and offered Payroll LLC a share of the fee for referrals.

75. ADP endorsed the partnership in writing. On December 7, 2020, Shepard confirmed to Feldman that a marketing email had "been approved for use." The approved text stated that "Payroll LLC is a proud partner of RUN Powered By ADP" and invited clients with "questions about our partnership" to contact Zinman. [DE 1-8 at 1].

76. The wholesale operation grew steadily and then fast. From January to April 2022, less than four months, Payroll LLC added approximately 150 accounts, a pace of about 600 a year, and almost all of them were ADP retail clients moving to wholesale under the 2020 Settlement Agreement.

77. Not every account stayed, and some never started; by early 2022 the wholesale book stood at about 352 clients, averaging about $2,100 a year in recurring revenue per client. About half of those clients were retail to wholesale transfers. Payroll LLC kept investing in that growth to the end. From January through April 2022, ADP accepted and set up new wholesale accounts for about 150 ADP retail clients and other new businesses Payroll LLC brought onto ADP's platform. Payroll LLC spent time and money on each one of those clients.

78. ADP watched that growth. Over the two years after the settlement, ADP representatives asked Payroll LLC regularly whether it would sell its client base to ADP. Payroll LLC said no every time. Each refusal left the transfer right in Payroll LLC's hands.

79. ADP could see the pace. Every transfer order went through ADP's order system, and every one needed approval from ADP's retail region before it could be completed. During the first

quarter of 2022, that was a pace of about 600 a year out of a retail base ADP reported at more than 800,000 small businesses.

80. On information and belief, ADP's wholesale leadership reviewed those numbers in the spring of 2022 and concluded that the transfer right, left in place, would cost ADP hundreds of retail clients a year for as long as Payroll LLC kept growing, and that the pace was rising, not falling. ADP had tried for two years to buy the right back and had failed. It decided that if it could not buy the right back, it would take it. Within weeks, it sent the sixty-day notice.

**L. Early 2022: "we don't know him"**

81. In early 2022, Payroll LLC's clients and prospects began reporting that when they called ADP to check on Payroll LLC's wholesale relationship, ADP's staff told them ADP did not know Payroll LLC.

82. On or about March 22, 2022, an ADP representative told a Payroll LLC client, Mary Mitchell Family and Youth Center, Inc., that a message from Payroll LLC did not come from ADP, and did not confirm to the client that Payroll LLC was an ADP wholesale partner. The client came away believing ADP had no relationship with Payroll LLC.

83. On March 30, 2022, an ADP client support consultant, Bradly Beverly, wrote to an ADP retail client that Payroll LLC had contacted: "I did speak with my supervisor on the matter, he does believe that is fraudulent or they are trying to sell themselves on bringing you on as an account. We do not have a partner that works with us for ERCs. I also am going to send a case over to our Business Security Team for further investigation on the account." The client wrote to Payroll LLC: "I called both retail and wholesale ADP and both couldn't verify you. I am going to have ADP do my ERC."

84. On April 1, 2022, Feldman sent Shepard three emails, copying Octavi. He forwarded the Beverly email and wrote: “this client states below that he called retail and wholesale and provided my client ID and EVERYONE told him I am a fraud. How is this happening?!?!? What can we do about this? ... I have had at least 5 DMs at ADP tell clients that I am a scam... and this is all in the last 30 days.” He wrote that “Folks are calling ADP and providing my client ID but they are being told I am a SCAMMER” and “I got 4 people that told me this yesterday alone.” And he reported “the third example from yesterday alone”: a client had called him at 9:30 p.m. to say he was a scammer “because ADP told her they don’t know who I am and they don’t know my company and they don’t know my client ID.” He added: “Just imagine how many times I run into situations every day or people are thinking that we are a scam because someone at ADP is unable to verify who we are.” Neither Shepard nor Octavi answered in writing.

85. Many of the businesses that heard this from ADP were prospects Payroll LLC had contacted about the Employee Retention Credit, using the partner signature ADP’s legal department approved on March 2, 2022. ADP knew about that outreach while it was happening. Feldman copied Zinman on emails to prospects on March 30, March 31, and April 5, 2022 so they could verify the partnership with her, and forwarded examples of the exchanges to Octavi on April 1, 2022. ADP never told Payroll LLC to stop, to change its signature, or to change anything else.

86. This was not a problem ADP lacked the tools to solve. Only ADP issues wholesale client IDs, ADP’s staff could look up Payroll LLC’s ID in ADP’s own system, and ADP’s RUN platform showed Payroll LLC’s contact information inside each wholesale client’s own account. And on March 2, 2022, ADP’s legal department reviewed and approved in writing Feldman’s email signature identifying Payroll LLC as a RUN Powered by ADP Payroll for Partners wholesaler,

with its ADP client ID. [DE 1-9 at 1]. Less than two months before the termination, ADP's own lawyers signed off on how Payroll LLC described the relationship to the world.

87. On April 14, 2022, Feldman wrote to Shepard again, asking for a call and for a way for his clients to confirm that Payroll LLC was an ADP wholesale partner, which he had been requesting "for several years." He wrote: "I am at a point where I need this resolved and a clear plan in place to do so."

88. That same day, Feldman asked Zinman to confirm the partnership to a prospect who wanted "some assurance that I am an ADP wholesale partner." Zinman replied within hours, copying the prospect: "Yes – Alex is a direct wholesale partner with ADP and I'm employed by ADP!" ADP's own sales manager had no trouble saying who Payroll LLC was. ADP's call centers would not.

89. On April 19, 2022, Octavi scheduled a call with Feldman and Shepard.

**M. April 26, 2022: the termination**

90. One week later, by letter dated April 26, 2022 from Jennifer Jacobs, Vice President of RUN for Partners, ADP ended the Partner Agreement effective June 25, 2022. Shepard sent the letter by email on April 27, 2022, copying Octavi, with a one-line cover note. The letter, and the form letter ADP prepared for Payroll LLC's clients, are in the record. [DE 1-10 at 1, 3].

91. The letter gave no reason. ADP claimed no breach, billing problem, service problem, or compliance problem, and in the nearly three years since the August 2019 letter had raised no complaint it chose to act on. In the twelve weeks before the letter, ADP had set up a second wholesale firm for Feldman at the same discount, scheduled a co-branding discussion, had its legal department approve his partner signature, and confirmed his partnership to his prospects. ADP never said it was thinking about ending the relationship. It kept accepting new businesses from Payroll LLC until the day of the notice: about 150 already in 2022.

92. The letter did not mention the 2020 Settlement Agreement or ADP's promise to accept transfers. ADP has never sent Payroll LLC any notice ending that promise.

93. On information and belief, ADP knew from its own conversion practices that a book of 352 payroll clients cannot be moved to another platform in sixty days. Every client runs payrolls weekly, every two weeks, or monthly, with tax deposits and quarterly filings that cannot lapse.

**N. ADP closes every exit**

94. After the letter, Feldman asked ADP to explain the termination and to work something out. ADP refused. He asked ADP to move the cutoff a few days, to the end of the calendar quarter on June 30, 2022, so each client's quarterly payroll tax filings could close cleanly, at no cost to ADP. ADP refused.

95. On May 13, 2022, before ADP had held a single meeting with Feldman about the termination, ADP emailed Payroll LLC's clients directly. The notice, sent in Jacobs's name, said only: "This serves as notification that ADP is terminating its relationship with Payroll LLC, as of June 25, 2022. To discuss concerns or issues with your account, please contact Payroll LLC directly." [DE 1-1 at 1]. It gave no reason. Clients wrote to Payroll LLC within minutes. One asked, "What do we do now?" Another: "Is there anything I need to do with my payroll account?" Another: "What does it mean and what is the impact on us?" One wrote: "We do not want to stop using ADP or its services." [DE 1-1 at 1, 3]. Payroll LLC had no answer to give them, because ADP had given it none.

96. Section 10(C) of the Partner Agreement let ADP notify clients of a termination. [DE 1-3 at 16, § 10(C)]. ADP used that right to put every Payroll LLC client in play four days before the first call it agreed to have with Feldman, and two weeks before it made its first offer to buy the book.

97. Feldman then proposed that Payroll LLC sell its wholesale business to a new owner on the same program terms, the same kind of handoff ADP had approved in 2019 and 2020. He offered to sell to a Payroll LLC employee, Franklin De La Cruz, to Joshua Gordover, or to Mariela Arroyo, and to step away from the business entirely. He also offered to bring in an outside buyer with no tie to him. He brought De La Cruz and Mariela Arroyo of MF Tax Group into the talks, forwarding them ADP's invitations to the May 17 and May 19 calls.

98. The written record shows one of those proposals. On May 29, 2022, after ADP sent its first buyout offer, Feldman wrote to Octavi: "I won't move forward with this agreement. The non-compete is unacceptable. I know they won't change it, so let's focus on the transfer of the clients to Mariela ASAP." He meant Mariela Arroyo of MF Tax Group, the affiliated firm that had held the wholesale business before October 2019 and whose remaining accounts ADP had itself moved into Payroll LLC in 2020. ADP had sent MF Tax LLC its own termination letter on April 26 [DE 1-10 at 2], so the proposal asked ADP to withdraw that notice as well. ADP did not agree. Two days later, with no other path open, Feldman sent ADP his requested changes to ADP's buyout contract instead.

99. ADP rejected every option and would not consent to a sale or handoff to anyone but ADP. A sale to another buyer on the same terms would have kept the same payrolls on ADP's platform at the same wholesale fees. ADP refused because any buyer in Payroll LLC's shoes would also have held the March 2020 transfer right. Ending that right, not keeping the clients, was ADP's goal.

100. About three weeks after the notice, with the deadline closing in, Feldman agreed to discuss a sale to ADP. On May 16 and 18, 2022, Octavi sent invitations for calls on May 17 and May 19 titled "ADP Wholesale Conversation." By May 20, ADP had a spreadsheet for the deal

named "Project Octagon Grid." On May 26, Octavi set a meeting titled "Project Octagon" with Wendy Hellman, whose ADP title was "Sales Executive Client Base Acquisitions." The next day, Hellman sent Feldman ADP's offer, a form contract, and a due diligence form, thanking him "for your time yesterday." ADP had a group whose job was to buy partners' client bases, and it had that group on Payroll LLC's within three weeks of the notice.

101. ADP set the terms. On June 6, 2022, Hellman wrote that ADP had agreed to do "NO due diligence at all" to "get the conversion expedited," that the price was a "2x multiple" of Payroll LLC's annual billings of about $700,000, and that ADP "reserve[d] the right to adjust our 2x multiple down" based on what clients later told ADP. On July 1, 2022, after reviewing Payroll LLC's billing data, ADP sent "updated pricing." On July 14, 2022, two days after Feldman signed, Hellman refused to add new clients Payroll LLC had just brought in: "We cannot add any more clients to Exhibit B. The contract is executed. These will be referrals."

102. On June 14, 2022, Feldman asked ADP in writing for a 30-day extension so the parties could finish the sale: "I can't waste time with the purchase if I have the termination hanging over my head."

103. On June 20, 2022, five days before the cutoff, he wrote again: "The talks about the purchase of my book have gone on for at least 2 weeks and I keep asking for someone to get me something in writing that the termination period is being extended but I am getting nothing in return." ADP did not answer until June 23, 2022, one day before the sixty days ran. The answer, which Hellman said came "directly from the wholesale team," was copied to Jennifer Jacobs, who had signed the termination letter. It let Payroll LLC keep using the wholesale platform after June 24 only "for the purpose of continuing to process payroll for any of your existing RUN wholesale clients during the process of transitioning these clients to ADP's RUN Retail platform." It barred

any new client: "Under no circumstances may you use the RUN Wholesale Platform to process payroll for any entity that is not an existing and active RUN wholesale client as of 06/24/2022." And it kept the hammer raised: "ADP may, as it deems necessary, terminate your access to the RUN Wholesale Platform at any time."

104. That was not a reprieve. It was a conversion schedule. From June 23, 2022 forward, Payroll LLC had to turn away new business. Between June 23 and July 5, 2022, Feldman had to send at least four new clients ready to start on Payroll LLC's wholesale account to ADP's own retail sales team instead.

105. With no time, no buyer but ADP, and no way to move 352 clients, Payroll LLC signed ADP's Payroll Services Conversion Agreement, effective July 11, 2022 (the "Conversion Agreement"). Under it, Payroll LLC sold ADP the right to convert its client base for an estimated price of $1,542,656. The Conversion Agreement, without its confidential client lists, is in the record. [DE 1-2].

106. ADP set that price while it held every card. The price was set by a formula based on the fees of Payroll LLC's existing clients [DE 1-2 at 2–3, § 2(b)] and included nothing for the transfer right, which died with the sale. It was paid out only as clients converted to ADP retail and stayed. On January 5, 2023, Hellman reported that "286 Controls converted and met retention for a payment of $901,998.46," that "47 Controls did not convert," and that the Conversion Agreement exhibits listed "353 Total Exhibits Controls." ADP paid nothing for the 47 clients it did not convert.

107. Once Payroll LLC agreed to sell to ADP, the sixty-day deadline no longer mattered to ADP. The Conversion Agreement required Payroll LLC to keep running its clients' payrolls through a "Final Conversion Date" of September 15, 2022. [DE 1-2 at 4, § 3(b); id. at 14, Schedule

1]. On August 1, 2022, ADP's wholesale group told Feldman, through Hellman, that "both the August and September 2022 invoices from ADP Wholesale will be valid and due from his firm in full." Clients ran payrolls on Payroll LLC's wholesale account into September 2022; one client's final wholesale payroll ran on September 8, 2022. On September 6 and 8, 2022, Octavi sent Feldman ADP's internal lists titled "UPDATED PROJ OTAGON HOLD LIFTED," showing the wholesale accounts ADP had put on hold on September 1 and released one by one as each client signed ADP's retail paperwork.

108. ADP ran the conversion with its own retail sales staff, who contacted Payroll LLC's clients directly to sign them to ADP retail agreements. Their script told the clients: "Starting September 1, you're not going to be able to do payroll on the Wholesale ADP platform ... Payroll LLC is moving over everybody to retail," as if the move had been Payroll LLC's idea.

109. So ADP could give more time when more time served ADP. It refused more time only when more time would have let Payroll LLC find another buyer or move its clients somewhere else.

**O. The Conversion Agreement did not release these claims**

110. The Conversion Agreement contains no release. Its integration clause is limited to agreements "concerning its subject matter," the sale of the right to convert Payroll LLC's client base. [DE 1-2 at 6, § 9(a)]. It does not address, release, or replace the 2020 Settlement Agreement, ADP's duties under the Partner Agreement, or any claim in this action. Payroll LLC does not seek to set aside the Conversion Agreement and does not claim that ADP breached it.

**P. ADP's staff kept disavowing Payroll LLC after the April 2022 notice**

111. ADP's statements to Payroll LLC's clients did not stop after Feldman's complaints or after the notice. For example:

(a) On June 15, 2022, while the Partner Agreement was still in force, the owner of Mo's Pit Barbecue Inc., a business Payroll LLC was working to sign up, wrote: "I spoke to ADP and they told me you were a scam."

(b) On August 4, 2022, while Payroll LLC's wholesale account was still open, the assistant director of Mayflower Montessori School, Inc., a Payroll LLC client, wrote: "I was told that you were partners with ADP and I just got off the phone with ADP and this is not true." On August 8, 2022, Feldman answered the school, copied Octavi, and asked him to confirm the partnership to the school.

(c) On August 9, 2022, a client told a Payroll LLC representative that ADP had said Payroll LLC was a scam. On August 12, 2022, another client wrote: "ADP SAID YOU GUYS ARE FRAUDULENT."

(d) On October 24, 2022, Feldman wrote to Octavi that a client "was told by ADP that they have no idea who we are," and asked Octavi to confirm to the client that Payroll LLC was "real."

(e) On November 4, 2022, another client wrote: "ADP has denied any affiliations with your company. They informed me that you are in no way in partnership with their company or have ever been in partnership with them." The client ended its engagement with Payroll LLC.

112. Shortly after, ADP's lawyers were demanding that Feldman stop telling anyone he had ever been an ADP partner. On December 21, 2022, ADP's outside counsel asked him to "remove any reference whatsoever to ADP from your email signature, website, marketing materials, or otherwise," including the true statement that he was a former ADP partner who had sold his payroll business to ADP. [DE 1-11 at 2]. ADP's staff told clients the partnership had never existed, and ADP's lawyers told Feldman not to say that it had.

113. ADP's managers and lawyers were told in writing about these statements on April 1, April 14, August 8, October 24, November 7, and November 15, 2022. ADP did not stop them.

114. The statements made after June 25, 2022 are pleaded to show ADP's knowledge, motive, intent, and pattern of conduct.

**GENERAL ALLEGATIONS**

115. New Jersey law governs both agreements. The Partner Agreement says so. [DE 1-3 at 17, § 11(G)]. The 2020 Settlement Agreement settled a dispute under the Partner Agreement, explained what its terms would mean going forward, and was made with ADP, a company based in New Jersey.

116. All conditions to bringing this action have occurred, have been performed, or have been waived or excused.

117. Under Federal Rule of Civil Procedure 8(d)(2) and (3), Payroll LLC pleads the following counts, and the measures of damages within them, in the alternative. Asserting any one count or measure of damages is not an admission, a choice, or a waiver as to any other. Payroll LLC does not seek to recover the same loss twice.

**COUNT I - Breach of the Implied Covenant of Good Faith and Fair Dealing in the Partner Agreement**

118. Payroll LLC re-alleges and incorporates paragraphs 8 through 36, 40, 43, and 53 through 117.

119. The Partner Agreement was a valid and enforceable contract between Payroll LLC and ADP, governed by New Jersey law. Payroll LLC performed its duties under it: it signed up and serviced its clients, ran their payrolls on ADP's platform, and paid ADP's wholesale fees. ADP never claimed otherwise.

120. New Jersey law reads a promise of good faith and fair dealing into every contract, including one that lets either side end it without cause. Neither party may do anything that will destroy or injure the other party's right to receive the fruits of the contract. A party breaches that

promise when it performs in bad faith, even if it breaks no written term, or uses a right or choice the contract gives it arbitrarily, unreasonably, or with a bad motive, to keep the other side from the benefits it reasonably expected.

121. This Count does not claim that ADP lacked the power to send a sixty-day notice under Section 10(A), or that the termination was not effective. It claims that ADP performed the Partner Agreement in bad faith, and used the discretion the Partner Agreement gave it under Sections 10(A) and 11(C) in bad faith, for an improper purpose, to strip Payroll LLC of the benefits of its bargain. ADP used its termination right as a pretext to take back the transfer right it had given Payroll LLC to settle a claim.

122. Payroll LLC's reasonable expectations under the Partner Agreement were set by its terms, by the parties' course of dealing, and by the 2020 Settlement Agreement, which ADP itself tied to the Partner Agreement. They included that:

(a) Payroll LLC would be its clients' point of contact for RUN, and ADP would not undercut it with those clients [DE 1-3 at 6, 15, §§ 2(B), 8(B)];

(b) ADP would stand behind the partnership it had approved Payroll LLC to advertise [DE 1-3 at 10–11, § 6(D); DE 1-8; DE 1-9];

(c) Payroll LLC could keep building its wholesale book and could receive ADP retail clients who chose to move to it in the normal course of business [DE 1-7];

(d) if Payroll LLC wanted to sell or hand off the business, ADP would judge a proposed successor in good faith, as it had in 2019 and 2020, and not refuse consent for a reason unrelated to the purpose of the consent right; and

(e) ADP would not use its right to end the relationship as a tool to take back the transfer right.

123. ADP breached the implied promise. Having taken the benefit of Payroll LLC's release, and having watched Payroll LLC build its business in reliance on ADP's promises for two years, ADP:

(a) while the Partner Agreement was in force, let its staff tell Payroll LLC's clients and prospects that ADP did not know Payroll LLC, or that it was a scam, including in writing on March 30, 2022, while its legal department was approving Payroll LLC's partner credentials in writing, did not tell Payroll LLC of those contacts, and let the practice continue after Feldman's written complaints in early 2022;

(b) decided to end the relationship in order to get rid of the March 2020 transfer right, after two years of failing to buy it back, and sent its notice one week after it scheduled a call to address Payroll LLC's complaints;

(c) kept that decision to itself while it let Payroll LLC keep investing in the relationship and bringing new businesses onto ADP's platform, up to the day of the notice;

(d) on May 13, 2022, before any meeting and before any offer, notified every Payroll LLC client directly that ADP was ending the relationship, with no explanation, and left Payroll LLC to face its clients' questions with nothing to tell them;

(e) refused every step that would have allowed an orderly exit, including an explanation, a workout, more time, and even a few days to reach the end of the quarter, and when it allowed more time on June 23, 2022, did so only to move the clients to ADP retail, barred any new client, and reserved the right to cut off access "at any time";

(f) used its consent right under Section 11(C) to block any sale of the business to anyone but ADP, including the May 29, 2022 proposal to move the clients to Feldman's affiliated firm, although ADP had approved the same kind of handoff in 2019 and 2020;

(g) refused a written extension while it negotiated to buy the business, and then, once Payroll LLC agreed to sell to ADP, kept the wholesale account running into September 2022 for its own benefit; and

(h) by these means, forced Payroll LLC to sell its client base to ADP at a price ADP set, with nothing for the transfer right.

124. Section 11(C) gave ADP discretion over consent, but not sole or unlimited discretion. The Partner Agreement gives ADP "sole" discretion elsewhere but not there. ADP had to use its consent right in good faith. It did not refuse consent because any proposed buyer could not perform. It refused consent to keep the transfer right out of anyone else's hands and to leave Payroll LLC no buyer but ADP.

125. ADP's motive was not a good faith business judgment about its partner. ADP gave no reason for the termination and claimed no breach, billing problem, service problem, or compliance problem. In the twelve weeks before the notice it had set up a second wholesale firm for Feldman, scheduled a co-branding meeting, approved his partner signature through its legal department, and confirmed his partnership to his prospects. It kept taking new clients from Payroll LLC until the day of the notice, including approximately 150 retail-to-wholesale transfers between January and April 2022. Its purpose was to end an obligation it had come to regret and to protect a retail base of more than 800,000 small businesses from further retail to wholesale transfers.

126. ADP's conduct destroyed the fruits of the Partner Agreement for Payroll LLC: the business it had built on ADP's platform, its ability to sell or hand off that business for fair value, and the transfer right that made the business worth more than its current client list.

127. ADP's conduct was deliberate and knowing, and was willful misconduct within the meaning of Section 9(B) of the Partner Agreement. ADP's managers knew from Feldman's written complaints what ADP's staff were telling his clients, and ADP's legal department had approved his credentials. ADP chose the timing, the terms, and the outcome to take back what it had promised. The damages cap in Section 9(B) does not apply.

128. Neither Section 9(E) nor Section 6(D)(iv) bars the damages sought in this Count. Section 9(E) is aimed at losses from the payroll service itself, and Section 6(D)(iv) at the use of ADP's marks, as alleged in paragraphs 34 and 35. Neither says that it shields ADP from its own willful misconduct or bad faith. ADP wrote these clauses, and they are read narrowly against it. Section 9(B), which applies "[n]otwithstanding anything to the contrary" in the Partner Agreement, shows the parties did not intend to excuse ADP's willful misconduct.

129. To the extent either clause could be read to excuse ADP's intentional, bad faith conduct, it would be unenforceable as against public policy.

130. As a direct and proximate result of ADP's breach, Payroll LLC has been damaged. Its damages are the direct and natural result of the breach and include:

(a) the value Payroll LLC lost because ADP's bad faith use of its termination and consent rights left Payroll LLC no time and no buyer but ADP, measured by the difference between the fair value of Payroll LLC's wholesale business, <u>including its transfer right</u>, and the amount ADP paid for it;

(b) the money Payroll LLC spent in reliance on the relationship, including the cost of bringing new businesses onto ADP's platform in 2022; and

(c) in the alternative to (a), the profits Payroll LLC lost for a reasonable period after the termination.

131. The damages sought in this Count are pleaded in the alternative to those sought in Counts II and III and are not the same loss claimed twice.

**<u>COUNT II</u> - Breach of the 2020 Settlement Agreement**

132. Payroll LLC re-alleges and incorporates paragraphs 8 through 36, 41 through 42, 47 through 74, 76 through 80, 90 through 110, and 115 through 117.

133. The 2020 Settlement Agreement is a valid and enforceable contract. Both sides gave something up. ADP promised a $35,000 payment and a going forward right to receive transfers of ADP retail clients. Payroll LLC released its claims arising from the Tennessee Restaurant Clients dispute, a book of business with a going value of $474,400, abandoning a $500,000 demand in reliance on that transfer right.

134. ADP's promise is in writing. ADP wrote it, and ADP's sales executive sent it in ADP's name to Payroll LLC, copying Anthony Horton, an ADP Divisional Vice President and General Manager, and Lynne Shepard, ADP's relationship manager. [DE 1-7]. Payroll LLC accepted ADP's written terms by its conduct: it gave up its claim, did not sue, and stayed in the program.

135. Octavi had authority to make the agreement. He was the ADP sales executive assigned to this relationship. Horton spoke for ADP on the call that produced the settlement, was copied on the email confirming it, and personally approved the $35,000 payment, as Shepard confirmed in writing on April 29, 2020. Octavi committed ADP staff by name to build the transfer process. And Octavi had made transfer commitments for ADP the same way before: on September 22, 2019, he confirmed by email, with his manager's approval, that ADP would accept retail transfers from firms Feldman acquired, and ADP honored that commitment.

136. ADP then approved the deal by carrying it out. ADP paid Payroll LLC the $35,000 on or about May 4, 2020 and accepted retail client transfers for about two years, with ADP's retail side approving each one. ADP's managers told other ADP employees in 2021 that ADP's legal department had approved Payroll LLC offering wholesale service to businesses using ADP. And ADP never told Payroll LLC that Octavi lacked authority.

137. Payroll LLC performed all of its duties. It released its claims, did not sue, and stayed in the wholesale program.

138. ADP's promise had no end date and no condition. It did not say it would end if ADP ended the wholesale relationship, and it did not mention Section 10(A). ADP wrote the email. Payroll LLC gave up a $474,400 book and a $500,000 demand for $35,000 only because of the promise's going forward value, as ADP knew.

139. A promise ADP could cancel at will, for nothing, the day after it took the release would have been worth nothing; that is not the deal the parties made. The parties meant the promise to last as long as Payroll LLC kept growing its wholesale business in the normal course, and at a minimum for a reasonable time well beyond two years. Payroll LLC was still receiving ADP retail transfers in the spring of 2022: about 150 between January and the April notice. ADP never gave notice ending its promise. Instead, it made the promise impossible to perform.

140. The transfer promise could be performed only if Payroll LLC had a wholesale account for transferred clients to move into. By making the promise, ADP necessarily agreed not to close that account, or block every successor to it, for the purpose of defeating the promise. Even if the promise depended on the account staying open, ADP is the party that closed the account, and it did so to end the promise. A party that prevents the other side from receiving the promised performance, or causes the failure of a condition its own promise depends on, cannot rely on that failure. It is in breach.

141. ADP breached the 2020 Settlement Agreement. It ended the wholesale relationship for the purpose of ending the transfer right, refused every buyer who would have kept a wholesale account open to receive transfers, and refused more time. After that, ADP accepted no more transfers, and its promise could not be performed at all.

142. In the alternative, if the 2020 Settlement Agreement changed or added to the Partner Agreement, ADP breached the Partner Agreement as changed. The transfer promise was a later and more specific term, made for separate consideration to settle a claim. Section 10(A), a general clause in ADP's form, did not give ADP the right to wipe out that later term by ending the relationship for that purpose. ADP's own termination letter describes the Partner Agreement as "amended." [DE 1-10 at 1].

143. ADP had actual notice of this breach well before this action was filed. On November 7, 2022, ADP's outside counsel sent Feldman a demand letter about his use of ADP's name. On November 15, 2022, Feldman spoke with ADP's counsel by phone and that evening wrote to them: "by terminating my wholesale agreement without cause, they have prevented me from exercising my settlement agreement 3/26/2020. Please let me know how ADP plans on resolving this breach." ADP's counsel wrote back on December 21, 2022, asking for a copy of "the 3/26/2020 settlement agreement that you referenced." [DE 1-11 at 2]. Feldman sent it the same day. ADP never answered the breach claim, including after Feldman followed up on January 11 and January 26, 2023.

144. As a direct and proximate result of ADP's breach, Payroll LLC has been damaged. Payroll LLC pleads the following measures of damages in the alternative:

(a) the benefit of its bargain, measured by the value of the going forward transfer right that ADP destroyed, including the profits Payroll LLC would have earned from the ADP retail clients that would have moved to its wholesale service from April 2022 forward. Those profits can be measured with reasonable certainty from ADP's own order records of the more than 250 transfers under the 2020 Settlement Agreement, including about 150 in the first four months of 2022, its average revenue per client, and its existing client base of more than 1,500 businesses in April 2022, all of them already Payroll LLC's own clients, a base that later grew to almost 7,000; or

(b) restitution of the value of what Payroll LLC gave ADP and was not paid for, measured by the $474,400 going value of the Tennessee Restaurant Clients book whose claims Payroll LLC released, less the $35,000 paid and the value of the transfers ADP accepted before it ended the promise.

145. The 2020 Settlement Agreement has no limit on liability, no cap on damages, and no waiver of lost profits or consequential damages. No limit in the Partner Agreement applies to this Count. If the 2020 Settlement Agreement is treated as part of the Partner Agreement, those limits still do not apply, for the reasons stated in paragraphs 127 through 129.

146. The damages sought in this Count are pleaded in the alternative to those sought in Counts I and III and are not the same loss claimed twice.

**COUNT III - Breach of the Implied Covenant of Good Faith and Fair Dealing in the 2020 Settlement Agreement (in the alternative to Count II)**

147. Payroll LLC re-alleges and incorporates paragraphs 8 through 36, 41 through 42, 47 through 74, 76 through 80, 90 through 110, 115 through 117, 133 through 137, and 140.

148. The 2020 Settlement Agreement is a valid and enforceable contract, and Payroll LLC performed its duties under it. Like every contract governed by New Jersey law, it carries an implied promise of good faith and fair dealing.

149. This Count is pleaded in the alternative to Count II. It applies if the Court finds that ADP's written promise was limited to the time the wholesale relationship lasted, or that ADP broke no written term of the 2020 Settlement Agreement.

150. Payroll LLC reasonably expected that ADP would not act to destroy the transfer right Payroll LLC had paid for by giving up its claim.

151. Even if ADP had the power under the Partner Agreement to end the wholesale relationship, it could not use that power in bad faith, and with a bad motive, to wipe out its separate promise under the 2020 Settlement Agreement. That is what ADP did. It ended the relationship

for that purpose, refused more time, and blocked every other buyer, so that the transfer right would not survive in anyone's hands.

152. ADP's conduct was willful and in bad faith, for the reasons stated in Count I.

153. As a direct and proximate result, Payroll LLC has been damaged in the ways described in paragraph 144. No limit in the Partner Agreement applies to this Count, for the reasons stated in paragraph 145.

## PRAYER FOR RELIEF

**WHEREFORE**, Payroll LLC requests judgment against ADP, Inc.:

(a) on Count I, awarding compensatory damages, including the difference between the fair value of Payroll LLC's business and the price ADP paid, reliance damages, and, in the alternative, lost profits for a reasonable period;

(b) on Counts II and III, awarding damages measured by the value of the going forward transfer right ADP destroyed or, in the alternative, restitution of the value of the claims Payroll LLC released, less the amounts described above;

(c) awarding pre-judgment and post-judgment interest and costs of suit; and

(d) granting such other and further relief as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Payroll LLC demands a trial by jury on all issues so triable.

## CERTIFICATE OF SERVICE

I certify that on October 29, 2026, I filed this document with the Clerk of Court using CM/ECF, which will send notice of electronic filing to all counsel of record.

Respectfully submitted,

*/s/ Clyde Dunton-Gallagher*
**CLYDE S. DUNTON-GALLAGHER, ESQ.**
Florida Bar No. 122012

**DUNTON GALLAGHER LEGAL PLLC**
3390 Mary Street, Suite 116
Miami, Florida 33133
Tel: +1 424 259 3334
csdg@pm.me
csdg_service@pm.me
clyde@tutanota.com
*Counsel for Plaintiff Payroll LLC*